# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br>v.<br><br>HARREL D. MARTIN,<br><br>      Defendant. | Case No. 19-CR-76-JPS<br><br>**ORDER** |

**1. INTRODUCTION**

On April 23, 2019, the defendant, Harrel D. Martin ("Martin"), was indicted on charges of possessing firearms as a convicted felon, possessing marijuana with the intent to distribute, and possessing firearms in furtherance of the marijuana-trafficking offense. (Docket #1). On June 7, 2019, Martin filed a motion to suppress physical evidence and his post-arrest statements. (Docket #9).

On August 16, 2019, Magistrate Judge David E. Jones held an evidentiary hearing on the suppression motion, at which two witnesses testified. (Docket #28, #34). On September 10, 2019, the motion was transferred to Magistrate Judge Nancy Joseph due to the unavailability of Magistrate Judge Jones. On October 7, 2019, Magistrate Judge Joseph issued a report and recommendation (the "Report"), recommending that this Court deny Martin's suppression motion. (Docket #36). Martin objected to the Report, (Docket #37), and the government responded to the objection, (Docket #38). For the reasons explained below, the Court will overrule Martin's objection, adopt the Report, and deny Martin's suppression motion.

## 2. STANDARD OF REVIEW

When reviewing a magistrate judge's recommendation, the Court is obliged to analyze the recommendation *de novo*. 28 U.S.C. § 636(b)(1)(C). Thus, the Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* In other words, the Court's *de novo* review of Magistrate Judge Joseph's findings and recommendations is not limited to her legal analysis alone; rather, the Court may also review her factual findings, and accept, reject, or modify those findings as it sees fit based upon the evidence. *Id.*

## 3. RELEVANT FACTS

In her Report, Magistrate Judge Joseph carefully described all of the facts material to Martin's motion. (Docket #36 at 2–7). Martin does not object to the Report's factual recitation, *see generally* (Docket #37), and the Court has no independent reason to disagree with the facts as Magistrate Judge Joseph found them. The Court will, therefore, adopt the facts as stated in the Report. In the interest of thoroughness, the Court will reproduce Magistrate Judge Joseph's factual recitation here. (Docket #36 at 2–7).

Milwaukee Police Officer Andrew Langer and Winetta Gill testified at the August 16, 2019 hearing.

*Officer Andrew Langer*

Andrew Langer has been an officer with the Milwaukee Police Department ("MPD") for about four-and-a- half years. (Docket #34 at 5–6). At the time of the evidentiary hearing, he was assigned to MPD District 7, working the early shift from 4:00 p.m. to 12:00 a. m. *Id.* at 5–7. Langer was performing general patrol on the night of January 11, 2019, when he and his partner, Officer Robert Guetchidjian, received a call requesting assistance with an investigation. *Id.* at 7–8. Fellow MPD Police Officers Gaglione and

Kotnik indicated that an individual named Harrel Martin had fled from them in an Infiniti and that they had observed a gun and drugs inside the vehicle. *Id.* at 8–9. They asked Langer and Guetchidjian to help locate Martin and the Infiniti. *Id.*

After checking one address, Langer and Guetchidjian met Gaglione and Kotnik and Sergeant Michael Hansen at a duplex located on North 91st Street. *Id.* at 9–10. Langer described the residence as an upper and lower duplex, with its front entrance—including a bay window—facing 91st Street and a side entrance on the residence's northwest corner. *Id.* at 10, 14–15, 19; *see* Hearing Exhibit C. The front of the duplex had a balcony for the upper flat. (Docket #34 at 10). There was also a wooden fence that ran from the northwest corner of the residence, which separated the front yard from the side entrance and back yard. *Id.* at 15, 40–41. After locating the Infiniti parked at the rear of the residence, the police set up containment around the duplex. *Id.* at 11, 61; *see* Hearing Exhibit C.

Once containment was established, Langer knocked on the front door of the lower flat with his baton. (Docket #34 at 12–13, 43). The tenant of the upper flat, Jasmine McNeil, came out onto her balcony, stated that she was putting her child to sleep, and asked—calmly but with slight agitation—why the police were there. *Id.* at 12–13, 43, 58–59; *see* Hearing Exhibit C. Langer explained that they were looking for someone and asked McNeil whether she had ever seen the Infiniti parked out back. (Docket #34 at 12). McNeil indicated that she had seen the Infiniti there a few times. *Id.* She then went back inside her residence. *Id.*

With McNeil back inside, Langer resumed knocking on the lower flat's front door. *Id.* at 13–14. Langer testified on cross-examination that a squad car drove onto the property and shined its lights at the bay window.

*Id.* at 41–42, 69–70; *see* Hearing Exhibit C. On re-direct, he said he did not recall a squad being on the lawn. (Docket #34 at 73). Regardless, Langer acknowledged that Hansen stood about five to eight feet from the residence, looked through a two-inch gap in the window's blinds, and observed a male walking around in a back room. *Id.* at 14–15, 42–43. Believing that the male could be Martin, officers knocked on the door again and held containment. *Id.* at 15.

At some point, a man claiming to be Winetta Gill's relative walked around to the front of the residence and spoke with the police. *Id.* at 15–16, 59–60; *see* Hearing Exhibit C. Langer asked for the man's help in locating Martin. (Docket #34 at 16). Langer then walked with the man along the northwest side of the residence to the back yard, passing through the open fence on their way. *Id.* at 16, 59–61; *see* Hearing Exhibit C.

At the rear of the residence, the other officers were speaking with Gill and a woman believed to be her mother. (Docket #34 at 15–16, 61, 66). Gill claimed that she was the only one in the lower flat. *Id.* at 16. When officers asked to enter the residence to look for Martin, Gill responded, "Go ahead and search it, you're not going to find anybody." *Id.* at 16–19. Gill then went inside her residence, shut the door behind her, turned off a light, and came back out saying, "Okay, come on in and search; he's not going to be in here. Nobody's in here. I'm the only one in here." *Id.* at 18, 72.

Officers entered the duplex through the side entrance. *Id.* at 17–19. Inside was a hallway with a door leading to the basement stairs, a couple stairs leading to the lower flat, and a stairway leading to the upper flat. *Id.* at 17–19, 62. As the officers entered the hallway, Gill position herself between the officers and the upper stairway; she did not seem to be concerned with the sweep of her residence. *Id.* at 19–20, 62–63. Officers

looked through the lower flat for about fifteen minutes, but they did not locate anyone inside. *Id.* at 20–21. They also checked in the basement; no one was there either. *Id.* at 21–22.

Finding no one in the lower flat or the basement, Langer proceeded up the stairs toward the upper flat. *Id.* at 22. As Langer was walking up the stairs, Gill screamed that he did not need to go up there because that tenant had kids, and she was "not part of this." *Id.* Langer went back downstairs, conferred with his colleagues, and then went back up, this time with Kotnik. *Id.* at 23–24. Gill again tried to dissuade the police from going to the upper flat, yelling, "She's not up there, she's not up there. She's been gone." *Id.* at 24–25. The officers explained that they just spoke to McNeil, the upper tenant, and knew she was still there. *Id.* at 25. Langer inferred from Gill's loud actions that she was "probably notifying someone that [the police were] on the stairs coming up that way." *Id.*

Once at the top of the stairs, Langer looked under the upper flat's door using his flashlight. *Id.* He did not observe anything. *Id.* Langer also could not hear anything going on inside the upper flat. *Id.* Then, Langer knocked on the door with his baton, announcing himself as police and asking McNeil to come to the door. *Id.* at 26. After about five minutes of knocking, McNeil finally opened the door. *Id.* at 26–27. She was "extremely frightened, crying, shaking" and pretended not to know why the police were there. *Id.* at 27. Officers asked if they could come in to "look for anybody who shouldn't be up here." *Id.* McNeil responded, "Yeah, go ahead and look." *Id.*; see *Id.* at 63–64. With their guns drawn, officers searched the upper flat. *Id.* at 27–30. The only people they located were McNeil and her young daughter. *Id.*

looked through the lower flat for about fifteen minutes, but they did not locate anyone inside. *Id.* at 20–21. They also checked in the basement; no one was there either. *Id.* at 21–22.

Finding no one in the lower flat or the basement, Langer proceeded up the stairs toward the upper flat. *Id.* at 22. As Langer was walking up the stairs, Gill screamed that he did not need to go up there because that tenant had kids, and she was "not part of this." *Id.* Langer went back downstairs, conferred with his colleagues, and then went back up, this time with Kotnik. *Id.* at 23–24. Gill again tried to dissuade the police from going to the upper flat, yelling, "She's not up there, she's not up there. She's been gone." *Id.* at 24–25. The officers explained that they just spoke to McNeil, the upper tenant, and knew she was still there. *Id.* at 25. Langer inferred from Gill's loud actions that she was "probably notifying someone that [the police were] on the stairs coming up that way." *Id.*

Once at the top of the stairs, Langer looked under the upper flat's door using his flashlight. *Id.* He did not observe anything. *Id.* Langer also could not hear anything going on inside the upper flat. *Id.* Then, Langer knocked on the door with his baton, announcing himself as police and asking McNeil to come to the door. *Id.* at 26. After about five minutes of knocking, McNeil finally opened the door. *Id.* at 26–27. She was "extremely frightened, crying, shaking" and pretended not to know why the police were there. *Id.* at 27. Officers asked if they could come in to "look for anybody who shouldn't be up here." *Id.* McNeil responded, "Yeah, go ahead and look." *Id.*; see *Id.* at 63–64. With their guns drawn, officers searched the upper flat. *Id.* at 27–30. The only people they located were McNeil and her young daughter. *Id.*

While walking through a back hallway, Langer noticed that the attic porthole was unlatched and that there was fresh insulation on the ground underneath the porthole. *Id.* at 29, 68. When officers asked McNeil who was in the attic, she put her head down and refused to answer. *Id.* at 30. After Kotnik told McNeil that she could go to jail if the police found out she was lying, McNeil "looked down and said, 'Yes, someone's up there.'" *Id.* at 31. Officers then escorted McNeil out of the residence, drew their firearms, moved the porthole with a baton, and called MPD's Tactical Enforcement Unit. *Id.*

While waiting for that unit to arrive, officers tried to coax Martin to come down from the attic voluntarily. *Id.* at 32. He finally did, after Guetchidjian threatened to deploy a chemical agent into the attic. *Id.* at 32–33. Officers then handcuffed Martin, placed Martin in a squad car, and obtained written consent from McNeil to search her residence. *Id.* at 34–35; *see* Hearing Exhibit B. The police also arrested Gill. (Docket #34 at 49–50).

Inside the attic, officers found three firearms and a backpack containing about 350 grams of marijuana. *Id.* at 35–36. McNeil told the police that nothing in the attic belonged to her. *Id.* at 54–55, 68. A few hours later, the police obtained a warrant to search the lower flat and the Infiniti. *Id.* at 36–37; *see* Ex. A to United States' Opposition to Defendant's Request for an Evidentiary Hearing, Docket #14-1.) In the lower flat they found a small amount of marijuana, a scale, a firearm, identifiers with Martin's name and address, and the jacket Martin was wearing when he fled from the police. (Docket #34 at 36–37). They found 6 grams of marijuana and Martin's ID in the Infiniti. *Id.* at 37. Officer Langer subsequently authored a supplemental police report regarding what happened at the 91st Street duplex on the night of January 11, 2019. *Id.* at 37–38; *see* Hearing Exhibit A.

*Winetta Gill*

Winetta Gill is the mother of Martin's four-year-old daughter. (Docket #34 at 82–83). Martin and Gill had dated off and on; according to Gill, the relationship was "on" at the time of the evidentiary hearing. *Id.* at 83.

On January 11, 2019, Gill was living in the lower flat of the 91st Street duplex. *Id.* at 74–75. Gill testified that four or five police officers came to her house that night and that one officer drove his squad car onto her front lawn. *Id.* at 75. The squad stopped at the bushes below the bay window and shined its spotlight inside the lower flat. *Id.* at 75–76. Gill spoke with the police outside the duplex, telling them that she did not want to let them inside her residence. *Id.* at 77. One of the officers responded that they would simply wait to get a search warrant—that is, they were going in one way or another, regardless whether Gill consented. *Id.* at 77–78. The police would not leave, so eventually Gill let them inside. *Id.* at 78–79. She testified that she believed she had a choice to refuse consent. *Id.* at 78. Indeed, Gill refused to sign a written consent form. *Id.* at 81–82.

Gill testified that the officers entered the duplex through the side entrance. *Id.* at 79. She stated that she was inside the residence when the officers performed the sweep of the lower flat. *Id.* at 80. After the sweep, Gill walked back outside by her mother and sister. *Id.* An officer then escorted Gill to a squad car, "roughed [her] up," and handcuffed her. *Id.* at 80–81, 83–84. Gill denied ever trying to prevent the police from going upstairs. *Id.* at 79–80.

4. **ANALYSIS**

Martin moved to suppress all evidence seized from the 91st Street duplex and his post-arrest statement to the police. He argued that the police

engaged in an unconstitutional search when they drove a squad car onto the curtilage of his home and shined their lights into a first-floor window without a warrant. (Docket #30 at 1, 3). According to Martin, this unconstitutional search was the catalyst for the events that followed, including the police's entry into the duplex, their location of Martin in the attic, their seizure of evidence found in the attic, and the issuance of the search warrant for the lower flat of the duplex. *Id.* at 1–3.

### 4.1 Magistrate Judge Joseph's Legal Conclusions

Magistrate Judge Joseph began her analysis by describing the extent to which the Fourth Amendment protects citizens from unreasonable searches of their homes. As she explained, the constitutional protection afforded by the Fourth Amendment to a home extends beyond the residence structure to the "curtilage" of the home. *See Bleavins v. Bartels*, 422 F.3d 445, 450–51 (7th Cir. 2005) (citing *Siebert v. Severino*, 256 F.3d 648, 653–54 (7th Cir. 2001)). "The home's curtilage encompasses 'the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home.'" *French*, 291 F.3d at 951 (citing *Siebert*, 256 F.3d at 653–54). When a law enforcement officer physically intrudes on the curtilage of a home to gather evidence without a warrant, the search is presumptively unreasonable. *See Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018); *Bleavins*, 422 F.3d at 451.

Magistrate Judge Joseph found it difficult to determine whether the officers involved in this case unlawfully entered the curtilage of the 91st Street duplex because the record does not contain photographs of the exterior of the home and does not otherwise provide specific details about the property's layout. However, even assuming that an officer was able to

peer into the home's front window through a gap in the blinds, assisted by the headlights of a squad car, Magistrate Judge Joseph found that suppression is not warranted. The evidence gathered from the home, she found, was not tainted by the invasion into the curtilage.

Specifically, Magistrate Judge Joseph found that the police's entry into the lower unit was not the result of entry into the curtilage; instead, police entered the lower unit after obtaining valid, voluntary consent from one of its occupants, Winetta Gill. (Docket #36 at 10–11). As to the upper unit, where Martin did not live and which the police accessed through a common area, Martin does not have standing to challenge the search thereof because he had no reasonable expectation of privacy there. *Id.* at 12. Even if he did have an expectation of privacy in the upper unit, the police entered that unit, including the attic where they found Martin, after obtaining valid, voluntary consent from its occupant. *Id.* Finally, the search warrant the police obtained for the lower unit and the Infiniti car was sufficiently supported by probable cause even without the allegedly tainted evidence gained from police peering through the front window. *Id.* at 13.

### 4.2 Martin's Objection to the Report

Martin's objection to Magistrate Judge Joseph's Report does not challenge any factual finding or legal standard on which she relied. Martin states that "while accurately stating the law regarding ingress upon curtilage, as well as that of the law regarding suppression of fruits of the poisonous tree, the Magistrate's report seems to misapply the law as stated in the report when applied to the facts as stated in her report and recommendation." (Docket #37 at 1). Martin makes a single argument in his objection: the police's entry onto the curtilage of his home was "the catalyst of all other facts which were the justification for the police actions which

resulted in the search and seizure [of the evidence Martin seeks to suppress]." *Id.* at 2. He cites no case law or other authority in support of his objection.

### 4.3 The Objection is Without Merit

The Court will not exclude otherwise admissible evidence under the exclusionary rule "when the causal connection between illegal police conduct and the procurement of evidence is so attenuated as to dissipate the taint of the illegal action." *United States v. Fazio*, 914 F.2d 950, 957 (7th Cir. 1990) (citing *Segura v. United States,* 468 U.S. 796, 805 (1984)) (internal marks omitted). In this case, even assuming that the police violated Martin's Fourth Amendment rights by entering the curtilage of the duplex, the subsequent search of the duplex, and obtaining of the search warrant, were not the result of the observation made through the front window or tainted by it. Therefore, suppression is not warranted on that basis.

Magistrate Judge Joseph recounted the various pieces of information, apart from observation made from the curtilage, that led the police to believe Martin was in the duplex, to seek consent to search the duplex, and to secure a warrant for the search of the lower unit and the car. *See generally* (Docket #36 at 10–14). For example, the Infiniti was parked outside and the police holding containment did not observe Martin leave. Further, Gill's behavior in talking loudly or screaming as if to warn the upstairs occupants that the police were heading upstairs led the police to suspect that Martin may be hiding in the upper unit. Both Gill and McNeil gave their consent to the search of their respective units, and there is no evidence to suggest that the police used any observations they made through the front window to overcome their will to gain their consent.

As to the search warrant affidavit, it contained only one paragraph referencing observations made through the gap in the blinds, and otherwise contained sufficient information to establish probable cause: It detailed Martin's initial encounter with the police wherein he fled in the Infiniti after an officer observed a firearm and marijuana in the vehicle, it noted that the vehicle was registered to Gill at the 91st Street address, and it stated that when officers arrived at that address a short while later, the Infiniti was parked on a rear parking slab.

Martin's objection provides no basis to disrupt Magistrate Judge Joseph's conclusion that these independent bases supported the searches and the search warrant. He does not object to the police presence at the 91st Street duplex, or to the conclusion that entry into each unit thereof was made after obtaining voluntary consent. His conclusory contention that all of the police conduct following their entry onto the curtilage was the direct result of what they saw through the blinds is simply not supported by the record.

5.  **CONCLUSION**

The Court is in agreement with Magistrate Judge Joseph's analysis in the Report. The Court will, therefore, adopt Magistrate Judge Joseph's Report, (Docket #36), overrule Martin's objection, (Docket #37), and deny the motion to suppress, (Docket #9).

Accordingly,

**IT IS ORDERED** that Magistrate Judge Nancy Joseph's October 7, 2019 Report and Recommendation (Docket #36) be and the same is hereby **ADOPTED**, and that Defendant's objection thereto (Docket #37) be and the same is hereby **OVERRULED**; and

**IT IS FURTHER ORDERED** that Defendant's motion to suppress (Docket #9) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 18th day of October, 2019.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge